# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CRIMINAL INDICTMENT |
| v. | NO. 1:11-CR-423-AT-GGB |
| JAMES EDWARD ROBERTS, | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

Defendant James Edward Roberts ("Roberts" or "Defendant") is charged with being a felon in possession of a firearm and one count of possession with intent to distribute methamphetamine, in violation of 18, United States Code, Section 922(g) and 21, United States Code, Sections 841(a) and (b).  Pending before this court is Defendant's  Motion to Suppress Statements and Motion to Suppress Evidence [Docs. 11 and 12].[1]  Two evidentiary hearings on these motions were held before me, the first on December 13, 2011 (Doc. 20, cited as "Tr. 1"), and the second on April 17, 2012 (Doc. 31, cited as "Tr. 2").  For the reasons discussed below, I recommend that Defendant's motions [Docs. 11 and 12] be **GRANTED IN PART AND DENIED IN PART**.

---

[1]Also pending is the Government's Motion for Extension of Time to File [Doc. 22].  That motion is hereby **GRANTED** *nunc pro tunc.*

## I.  FACTS

On February 3, 2011, a guest in Room 1205 at the Comfort Suites hotel ("the hotel") in Atlanta complained to Crystal Wright, the Assistant Manager of the hotel, that he saw a possible drug transaction involving the guests in Room 1204.  Ms. Wright went to Room 1204 accompanied by Officer Funderbrik,[2] an off-duty Atlanta Police Officer, who at the time, was working as a security officer at the hotel.  Officer Fundererbrik was in full police uniform and in possession of his firearm.  (Tr. 1, pp. 6-8, 12, 22-3).

Ms. Wright went to Room 1204 and knocked on the door.  An occupant of the room opened the door. (Ms. Wright could not recall who opened the door.) Officer Funderbrik was standing next to or behind Ms. Wright and would have been visible to the person who opened the door.  (Tr. 1, p. 24, 27, 30).  Ms. Wright could see the Defendant sitting on a couch in the living area of the room.  (Tr.1, p. 10).

Ms. Wright asked if she could enter, and Defendant agreed to allow Ms. Wright to enter the room.  Ms. Wright and Officer Funderbrik then came into the room together.  Ms. Wright asked what was going on and the occupants said that nothing was

_____

[2]Officer Funderbrik did not testify at either evidentiary hearing.

AO 72A
(Rev.8/8
2)

going on. (Tr.1, p. 10). Ms. Wright asked if she could look around and was given permission to look around. (Tr.1, pp. 11, 44).

The suite had a separate living room, bedroom and bathroom. At the hearing, the government attorney asked Ms. Wright if she saw anything in the bedroom. She answered by describing only what she saw in the bathroom. In the bathroom she saw white residue on the counter, a needle/syringe, and what appeared to be a drug smoking pipe. (Tr. 1, pp. 11, 39). Ms. Wright then informed Officer Funderbrik of what she observed and let him take over. (Tr. 1, pp. 11-12, 27).

Officer Funderbrik then repeatedly asked the occupants of the room if there was anything else, and eventually Defendant produced some more drugs and gave them to Officer Funderbrik. (Tr. 1, pp. 15, 40-41, 46-7). Using his radio, Officer Funderbrik requested the assistance of other officers. (Tr. 1, p. 48).

At some point, additional officers and friends of Defendant arrived in the room, and Ms. Wright left the room. (Tr. 2, p. 12).[3] Officer Noble was the first on-duty officer

---

[3]There is a conflict in the testimony about whether Ms. Wright left the room before other officers arrived. Ms. Wright testified consistently that she did not leave the room until other officers arrived. Yet Officer Noble, the first on-duty officer to arrive, said that he did not recall seeing Ms. Wright in the room when he arrived. (Tr. 50). I do not need to resolve this conflict, as it does not affect the outcome of the Motion to Suppress.

3

to arrive. He saw that several people, including Defendant had been placed in handcuffs and were sitting on the couch in the living room. (Tr.1, 49-50). Officer Noble walked into the bedroom area where he saw suspected narcotics in a clear plastic bag on top of an open laptop computer on the television stand in the bedroom. (Tr.1, pp. 51, 59; Gov. Exs. 2, 3).

Officer Noble contacted Sergeant Garden, who was a narcotics investigator, and informed him of the drugs that were found in the hotel room. Sergeant Garden informed Officer Noble that two narcotics investigators were already on their way. (Tr. 1, p. 51). Officer Noble asked the individuals in the room for their identifications, but he did not ask them any questions other than those pertaining to biographical information. (Tr. 1, p. 52).

Eventually, Atlanta Police Department narcotics investigators Peter Trotta, Jason Plummer, and Anthony Kirkman arrived at and entered the hotel room. (Tr. 1, pp. 63, 102). Officer Funderbrik and Ms. Wright informed Investigators Trotta and Plummer what had occurred up to that point. Investigator Trotta asked Defendant for consent to search the room, and Defendant gave consent. Investigator Trotta gave Defendant a consent form on which Defendant filled out his name and age and signed at the bottom of the form. (Tr. 1, p. 66; Gov. Ex. 16).

4

The pre-printed form stated:

1.   I HAVE NOT BEEN PROMISED ANYTHING IN EXCHANGE FOR MY CONSENT TO SEARCH;

2.   I HAVE THE RIGHT TO REFUSE MY CONSENT TO SEARCH;

3.   I HAVE THE RIGHT TO REVOKE MY CONSENT TO SEARCH AT ANY MOMENT;

4.   I HAVE NOT BEEN PHYSICALLY OR MENTALLY THREATENED OR COMPELLED TO GIVE MY CONSENT, AND;

5.   I CAN READ, WRITE AND UNDERSTAND THE ENGLISH LANGUAGE.

(Gov. Ex. 16)

While Defendant was filling out the consent form he volunteered without being questioned that there were drugs and guns in the room and that all the drugs and guns in the room were his. (Tr. 1, pp. 67, 91, 99-100, 106-07, 110). After Defendant signed the consent form Investigators Trotta and Plummer searched the hotel room and found in the bedroom or bedroom closet two guns, bullets, multiple baggies of methamphetamine, a glass pipe, pills, and $400 cash. None of these items were in plain view in the room. (Tr. 1, pp. 70-71, 111-13, Gov. Ex. 12-15).

5

After the consent form was signed and just as the search was beginning, Investigator Kirkman advised Defendant of his <u>Miranda</u> rights. (Tr. 1, pp 103, 110, 113, 115; Gov. Ex. 17). Defendant signed a form acknowledging that he understood and waived his rights. (Gov. Ex. 17). Defendant then wrote a narrative on a police department debriefing form admitting that he was a drug addict, that he sold drugs to get his drugs, and that the drugs and the guns in the room were his. (Gov. Ex. 18).

Additional facts are discussed in context below.

## II.    **DISCUSSION**

I will proceed to review the actions that resulted in the government obtaining evidence or statements against Defendant in order to determine whether any of these actions violated Defendant's constitutional rights.

### A.    **Defendant consented to Ms. Wright's entry and search**

Defendant consented to Ms. Wright's entry into and search of his hotel room. Where the validity of a search rests on consent, the government "has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority." <u>Florida v. Royer</u>, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). In deciding whether the government has met its burden, the court must consider

6

the totality of the circumstances.  <u>Schneckloth v. Busamonte</u>, 412 U.S. 218, 227, 93 S.

Ct. 2041, 2047, 36 L. Ed. 2d 854 (1973). I find that under the totality of circumstances,

the government has met its burden of proving consent.

Therefore, even if Ms. Wright was not acting as a private citizen, and her search

implicated the Fourth Amendment, her entry and search did not violate Defendant's

constitutional rights.  As set forth above, during her search, Ms. Wright observed drug

residue and paraphernalia in the bathroom.  Her observation and that evidence should

not be suppressed.  I note that although Ms. Wright entered the bedroom, she did not

observe any drug residue or other suspected contraband in the bedroom.

**B.** **<u>Officer Funderbrik was not acting as a private citizen when he entered Defendant's hotel room; his warrantless entry was unlawful.</u>**

Defendant challenges Officer Funderbrik's entry into his hotel room on the

grounds that Officer Funderbrik did not have consent and was not acting as a private

citizen. The government does not argue that Defendant or any other occupant of the

room consented to Officer Funderbrik's entry.  Rather, the government argues that

Officer Funderbrik was acting as a private citizen when he entered the room.  I reject

this argument.

The Fourth Amendment applies only to government action, and therefore is not

applicable to searches and seizures made by private individuals not acting as agents of

7

the government or with the participation or knowledge of a government official. <u>United States v. Jacobsen</u>, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). The government argues that the court should apply the two-factor test developed by the Eleventh Circuit "[t]o determine whether a private person was acting as an instrument or agent of the government." (Doc. 23 at p. 11, citing <u>United States v, Propst</u>, 369 F.App'x. 42, 45 (11th Cir. 2010), and <u>United States v. Steiger</u> 318 F.3d 1039, 1045 (11th Cir. 2003). Under that test, the court considers "(1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." <u>Steiger</u> 318 F.3d at 1045; <u>Propst</u>, 369 F.App'x. at 45.

However, this test applies only to "private persons". Before applying this test, the court must first determine whether Officer Funderbrik was in fact acting as a "private person" during the relevant events in this case. On this issue, cases addressing whether off-duty police officers are acting under color of state law for purposes of determining whether they are liable for violating a person's constitutional rights in violation of 42 U.S.C. § 1983 are instructive. One such case is <u>Bouye v. Marshall</u>, 102 F. Supp.2d 1357 (N.D. Ga. 2000). In that case, United States District Judge Thomas W. Thrash, Jr. addressed whether an off-duty Gwinnett County police officer was acting as

8

a private person when he conducted a search and seizure of a person in the parking lot

of an apartment complex where the officer was working as a security guard. Id. at 1362.

Judge Thrash concluded that the officer was acting under color of state law;  on this

issue he wrote:

> A defendant acts under color of state law by "acting with power possessed
> by virtue of the defendant's employment with the governmental entity."
> Edwards v. Wallace Community College, 49 F.3d 1517, 1522 (11th
> Cir.1995). Government employment alone, however, is insufficient. "The
> dispositive issue is whether the official was acting pursuant to the power
> [he] possessed by [government] authority or acting only as a private
> individual." Id. at 1523. Although Marshall was working as a security
> guard at the apartment complex, he may be considered a state actor for
> purposes of § 1983 individual liability if his acts were related to the
> performance of his police duties and were carried out pursuant to authority
> conferred by the state. See West v. Atkins, 487 U.S. 42, 49–50, 108 S.Ct.
> 2250, 101 L.Ed.2d 40 (1988) ("It is firmly established that a defendant in
> a § 1983 suit acts under color of state law when he abuses the position
> given to him by the State ... [either] while acting in his official capacity or
> while exercising his responsibilities pursuant to state law."); Traver v.
> Meshriy, 627 F.2d 934, 937–38 (9th Cir.1980) (an off-duty police officer
> working as a security teller pursuant to the police department's secondary
> hiring program, whose primary duty in the event of a crime was to the
> department rather than the bank, acted under color of law when he detained
> a customer); Penn v. City of Miami, 1999 WL 1050059, *13
> (S.D.Fla.1999).

> Bouye, 102 F.Supp.2d at 1362.

Judge Thrash then noted that the officer was wearing his police clothing and

displayed his badge, "the ultimate symbol of his authority as a police officer.  Moreover

9

he was performing a police function in patrolling the apartment complex and investigating suspicious behavior. He used his authority as a police officer to detain and search [the plaintiff]." Id. Based on these facts, Judge Thrash concluded that the officer's actions were not those of a purely private citizen. See also Roberts v. City of Hapeville, Case No. 1:05-cv-1614, 2007 WL 521901 at *3 n.7 (N.D. Ga. 2007) (J. Duffey)(citing Judge Thrash's opinion to find that an off-duty City of Hapeville police officer was acting within his discretionary authority as an officer of the police department when he arrested plaintiffs)

Similarly in Quinones v. Maier & Berkele, Inc., 385 S.E. 2d 719, 720 (Ga. App. 1989), the plaintiff's law suit included a claim under § 1983 for false imprisonment and unlawful seizure against an officer working as a private security guard at a jewelry store. The Georgia Court of Appeals reversed the trial court's directed verdict for the officer, noting that at the time of the incident, the officer was dressed in her police uniform and was wearing her city-issued revolver, badge, and walkie-talkie radio. The court stated: "As a city police officer, appellee Jansen was on duty at all times, even when not working normal shifts." Id. See also Duncan v. State, 294 S.E.2d 365, 366 (Ga. App. 1982)("[A]ll law enforcement officers have the general duty to enforce the law and maintain the peace. They carry this duty twenty-four hours a day, on and off duty.");

10

Elaine K. Zipp, Annotation, <u>Actions of off-duty policeman acting as private security guard as actions "under color of state law" actionable under Civil Rights Act of 1871 (42 U.S.C.A. § 1983)</u> 56 A.L.R. Fed 895 (1982)(collecting cases).

Officer Funderbrik was in full police uniform, carrying a weapon, and investigating a possible crime, all of which were authorized by state law.  He did not tell Defendant that he was acting as a private citizen, and there was no reason for Defendant to believe that  Officer Funderbrik was acting as anything other than a police officer. After his entry, Officer Funderbrik  questioned Defendant about drugs and used  his authority as a police officer to handcuff and detain the Defendant.  The officer presumably used police equipment to handcuff the Defendant and to radio for assistance from other officers.  Based on these facts and the applicable authorities, I find that Officer Funderbrik was acting under color of law, and not as a purely private person when he entered Defendant's hotel room.

It has long been established that hotel management does not have authority to allow law enforcement agents to enter a guest's hotel room without a search warrant. <u>Stoner v. State of California</u>, 376 U.S. 483, 489, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964). Because there was no search warrant, consent, or exception to the warrant requirement, Officer Funderbrik's entry into Defendant's hotel room  was in violation of the Fourth

11

Amendment. The government did not argue or prove that there was any intervening factor that attenuated the connection between Officer Funderbrik's entry and his obtaining of evidence and statements. Thus, any evidence or statements obtained by Officer Funderbrik should be suppressed.[4]

**C. The drugs found by Officer Noble should be suppressed because the evidence supports the inference that the drugs Officer Noble saw in the bedroom were the product of questioning or search by Officer Funderbrik**

Unlike the officers who arrived after him, Officer Noble did not have consent to search. The government argues that Officer Noble's entry and search was lawful because Defendant had already authorized a private search by Ms. Wright, and Officer Noble's search did not exceed the search conducted by Ms. Wright. (Doc. 33, p. 11). The government relies in large part on United States v. Jacobsen, 466 U.S. 109, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). (Doc. 23, p. 21-2; Doc. 33, p. 6). In Jacobsen, private Federal Express employees opened and searched a package and discovered that it contained contraband. They then notified the police that the package contained

---

[4]Because of my recommendation that any evidence or statements obtained by Officer Funderbrik should be suppressed on Fourth Amendment grounds, I do not address Defendant's argument that Officer Funderbrik violated Defendant's Fifth Amendment rights when he interrogated Defendant without advising him of his Miranda rights. (Doc. 21, p. 25). Also, the government does not intend to use any evidence or statements obtained by Officer Funderbrik. (Doc. 23, p. 25).

12

AO 72A
(Rev.8/8
2)

contraband, and the police then searched and seized the package without a warrant. The Supreme Court upheld the warrantless search on the grounds that "the package could no longer support any expectation of privacy," and that "[s]uch containers may be seized, at least temporarily, without a warrant." 466 U.S. at 121, 104 S.Ct. 1652. The court based its decision in part on the fact that "the tube and plastic bags contained contraband and little else," and accordingly, the "warrantless search was reasonable, for it is well settled that it is constitutionally reasonable for law enforcement officials to seize 'effects' that cannot support a justifiable expectation of privacy without a warrant, based on probable cause to believe they contain contraband." Id. at 121–22, 104 S.Ct. 1652.

As the government acknowledges, the Eleventh Circuit has not squarely ruled on whether Jacobsen allows law enforcement officers to conduct a warrantless search of a residence based solely on an earlier lawful private search of that residence. (Doc. 33, p. 6). Other circuits that have ruled on this issue have held that Jacobsen should not be expanded to cover warrantless police searches of private residences or hotel rooms. See United States v. Young, 573 F.3d 711 (9th Cir. 2009); United States v. Allen, 106 F.3d 695, 699 (6th Cir. 2011); Cf. United States v. Paige, 136 F.3d 1012, 1020, n.11 (5th Cir. 1998)

AO 72A
(Rev.8/8
2)

In Paige, a homeowner had allowed roof repairmen access to his garage attic. They found marijuana in the attic and told the sheriff's department about their finding. A narcotics investigator then went to the property pretending to be a roofer, climbed up into the attic, and observed the packages of marijuana. The court agreed with Allen not to extend Jacobsen's holding to private searches of residences, stating, "[a] decision any other way would make the government the undeserving recipient of considerable private information of a home's contents strictly through application of an inflexible rule. We refuse to reward the government with such a windfall . . . ." Paige, 136 F.3d at 1020, n. 11. However, the court in Paige went on to find that the homeowner, who had allowed the roof repairmen to access his attic, no longer had a reasonable expectation of privacy in the marijuana found in the attic because the repairmen's intrusion into the attic was reasonably foreseeable. Id. at 1019-21. Thus, according to the court, the search of the narcotics detective did not implicate the Fourth Amendment. Id. at 1021.

Another potentially applicable case is United States v. Ford, 765 F.2d 1088 (11th Cir. 1985). The government and the defense in this case disagree on whether Ford suggests that a warrantless police search of a residence can be upheld based on an earlier private search. In Ford, the defendant lived in a room in a house also occupied by his brother. Acting on a tip from an informant that the defendant had cocaine in his room,

AO 72A
(Rev.8/8
2)

DEA agents went to the house and requested consent to search from defendant's brother. Defendant's brother gave the agents permission to search the house with the exception of defendant's bedroom which was locked. The agents then asked if they could return with a narcotics detecting dog, and the brother said yes. After the agents left, defendant's brother broke the lock on defendant's bedroom door, entered and found cocaine in his room. The agents returned the next day, the brother allowed them to enter the house, and the dog alerted to the presence of cocaine. Based on this information, the agents obtained a search warrant, entered the defendant's bedroom and found the cocaine. <u>Id.</u> at 1089.

The Eleventh Circuit ruled only that the brother had not acted as an instrument or agent of the government in conducting his search of the defendant's bedroom. <u>Id.</u> at 1090. The court did not rule that the DEA agents had the authority to enter defendant's room without a search warrant. I cannot agree with the government's position that <u>Ford</u> stands for the broad and far-reaching proposition that law enforcement agents may enter a private residence without a warrant based solely on a previous private search that uncovered contraband. If accepted, the government's argument could result in a significant exception to the general rule that "[b]elief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification of a search of

15

that place without a warrant. " Johnson v. United States, 333 U.S. 10, 14, n. 14, 68 S.Ct. 367, 92 L.Ed. 436 (1948) (quotation omitted).

However, for the following reasons, it is not necessary for this court to decide the important issue of whether and to what extent Jacobsen should be extended to private searches of residences: The only incriminating evidence seen by Officer Noble was the drug residue in the plastic bag on the laptop computer in the bedroom. It is undisputed that Ms. Wright did not see this evidence when she entered the bedroom, and that Defendant produced drugs in response to questioning by Officer Funderbrik. As stated previously, Officer Funderbrik did not testify at either of the hearings.

The evidence suggests, and I infer, that the drugs seen by Officer Noble were not in the bedroom when Ms. Wright conducted her search, and their unexplained presence in plain view in the bedroom at the time of Officer Noble's search was the result of questioning or a search by Officer Funderbrik. For this reason, the finding of the drugs in the plastic bag on the laptop computer was not sufficiently attenuated from the illegal (non-private) entry of Officer Funderbrik, and should be suppressed on that basis. Further, for reasons discussed below, I conclude that even if the later entry of the narcotics investigators was unlawful, the drugs and other incriminating evidence found

16

AO 72A
(Rev.8/8
2)

by the narcotics investigators after Defendant's consent to search should not be suppressed.

**D.    Even if the entry of the narcotics detectives was unlawful, the evidence that they located and seized after obtaining Defendant's consent to search should not be suppressed.**

As stated previously, narcotics investigators entered the hotel room and searched the room after obtaining written consent to search from Defendant.  Defendant argues that the entry of the narcotics investigators was unlawful, and their entry and the previous events tainted the subsequent consent to search. The government argues that even if the entry of the narcotics investigators was unlawful, the evidence that was located by them following Defendant's consent to search should not be suppressed.  I agree with the government's position.

When the government relies on consent to justify a search that follows an illegal entry, the government must prove two things:  first, that the consent was voluntary; and second, if voluntary, that the consent was not the product of the illegal entry.  United States v. Delancy, 502 F.3d 1297, 1308 (11th Cir. 2007); United States v. Welch, 2012 WL 2122163, at *3 (11th Cir. June 13, 2012);  United States v. Santa, 236 F.3d 662, 676 (11th Cir. 2000); see also United States v. Quintana, 594 F.Supp.2d 1291, 1303 (M.D. Fla. 2009).

AO 72A
(Rev.8/8
2)

Consent to a search is voluntary "if it is the product of an 'essentially free and unconstrained choice.'" United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001) (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The government bears the burden of proving that the consent was given voluntarily and not in acquiescence to a claim of lawful authority. United States v. Blake, 888 F.2d 795, 798 (11th Cir. 1989).

The consent form that Roberts signed advised him of his rights to refuse and revoke his consent. The officers did not threaten Roberts, and Roberts clearly displayed his intention to cooperate with the officers. Considering the totality of circumstances, the government has met its burden of showing that Roberts's consent to search was voluntary. Therefore, I will proceed to discuss whether Roberts's consent was the product of the officers' illegal entry.

Evidence is not considered the product of the illegal actions of the police simply because the evidence would not have come to light but for the illegality. Rather, the court must resolve whether the evidence that Defendant seeks to suppress has been obtained by exploitation of the illegality. The court is obliged to determine whether the consent was "sufficiently an act of free will to purge the primary taint of the unlawful invasion," or, alternatively, whether the causal connection had "become so attenuated

18

as to dissipate the taint." <u>Wong Sun v. United States</u>, 371 U.S. 471, 486-88, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963) (internal quotation omitted); <u>Delancy</u>, 502 F.3d at 1309 (quoting <u>Wong Sun</u>, 371 U.S. at 488, 83 S.Ct. 407). This is a fact-specific question and no single fact is dispositive. <u>Delancy</u>, 502 F.3d at 1309.

In <u>Delancy</u>, <u>Santa</u>, and <u>Welch</u>, the Eleventh Circuit considered three non-exclusive factors that gave the court a "useful structure" in making this determination: the time that elapsed between the illegal act and the search, any intervening circumstances, and the purpose and flagrancy of the unlawful government conduct. <u>Delancy</u>, 502 F.3d at 1309; <u>Santa</u>, 236 F.3d at 677; <u>Welch</u>, 2012 WL 2122163 at *3. In <u>Delancy</u> and <u>Welch</u> the court found that the police had obtained knowing, intelligent and voluntary consent without exploiting their unlawful entry. The court thus declined to suppress the evidence found after the consent. In contrast, in <u>Santa</u>, the court found the evidence should be suppressed. In that case, the DEA broke down the door, handcuffed the suspect, placed him face down on the floor, and within three minutes, while in that position, the suspect told the agents where they could find the drugs. By the time the suspect had signed the consent form, the agents had already searched for and discovered the evidence. The court in <u>Santa</u> found that the consent, even if voluntary, did not purge the primary taint of the illegal entry and arrest.

19

With regard to the temporal factor, a longer interval weighs in favor of admissibility.  Delancy, 502 F.3d at 1310.  However, in Delancy, even though the consent was only fifteen minutes after the illegal police action, the court found that the interaction between the consenting individual and the officers was "conversational" and non-threatening, and under those circumstances the timing was not that important.  Id. at 1310-11.  Here, the time that elapsed between the illegal entry of the narcotics detectives and the search was brief, perhaps as little as ten minutes; but as in Delancy and Welch, the timing is not the  most important factor.  Welch, 2012 WL 2122163 at *3.  I have taken into consideration that Defendant here was handcuffed and detained, unlike the consentor in Delancy.  However, during the interval between the entry and the consent, the interaction between Defendant and the narcotics investigators was non-threatening, and Defendant displayed an eagerness to cooperate. (Tr. 1, p. 94, 100, 106-7).  As instructed by the Eleventh Circuit,  I have decided whether consent was tainted by illegality with "'a pragmatic evaluation of the extent to which the illegal police conduct caused the defendant's response,' not with a stopwatch."  Welch, 2012 WL 2122163 at *3 (citations omitted).

The second factor, intervening circumstances, focuses on whether there was any interruption in the causal connection between the illegal act and the possibly tainted

20

AO 72A
(Rev.8/8
2)

consent. <u>Delancy</u>, 502 F.3d at 1311. The consentor's review and signing of a consent form which clearly states that he had the right to refuse consent may constitute "an important intervening circumstance." <u>Id.</u>

Here, I consider it significant that Defendant reviewed and signed a comprehensive consent form that advised him of his right to refuse or revoke his consent. In <u>Delancy</u>, the court found that the "thorough notification of constitutional rights constitutes an important intervening circumstance." <u>Delancy</u>, 502 F.3d at 1311. Moreover, here, Defendant was very cooperative, volunteering that there were drugs and guns in his room even before the officers had a chance to advise him of his rights. (Tr. 1, p. 94, 100, 106-7).

In addressing the third factor, the purpose and flagrancy of the officers' conduct, the Eleventh Circuit has considered whether: (1) the illegal entry was made with the express purpose of gaining consent; (2) the search was limited or broad in scope; and (2) whether officers used illegally seized evidence to obtain consent. <u>Delancy</u>, 502 F.3d at 1312-13.

With regard to the purpose of the entry, here, the narcotics investigators were called to assist an off-duty officer who was acting as a security guard and other officers who were already in the room. (Tr. 2, pp. 2, 28). The hotel manager and the officers

AO 72A
(Rev.8/8
2)

in the room had already found illegal drugs in the room. Thus, the narcotics investigators entered the room to back-up fellow officers, not for the purpose of exploiting an illegal entry. In upholding the search in <u>Delancy</u>, the court found it important that the illegal entry was for the protection of the officers, not a subterfuge to intimate and question the suspect. <u>Delancy</u>, 502 F.3d at 1312.

Moreoever, as in <u>Delancy</u>, there is no suggestion that the narcotics investigators exploited the evidence found prior to consent. Officer Funderbrik told the narcotics investigators only that the hotel manager had received complaints, and that when the manager entered the room, she saw that the smoke alarms had been covered up and that there was narcotics or narcotics paraphernalia in the room. (Tr. 1, pp. 64-5). Although the narcotics investigators did tell Defendant that they had been called to the location "in regards to suspected narcotics in the hotel room," there is no evidence that the investigators confronted Defendant with the evidence already found by Officers Funderbrik or Noble in order to obtain his consent. (Tr 1, pp. 68, 94-95).

Additionally, it would have been unclear to the narcotics detectives whether they needed consent to enter Defendant's room. The narcotics investigators knew that the hotel manager and Officer Funderbrik had already entered and had seen suspected narcotics in the room, and that other officers were in the room. (Tr. 1, p. 65; Tr. 2,

AO 72A
(Rev.8/8
2)

p. 21). The door was propped open with the deadbolt. (Tr. 1, p. 12; Tr. 2, pp. 7, 28). Thus, when the narcotics detectives arrived, they could have reasonably assumed that Officer Funderbrik and/or the hotel manager had lawfully entered the room in their capacities as hotel employees and that the control of the room had reverted back to the hotel.

Finally, the narcotics investigators did not act flagrantly. They did not conduct a forced entry, point weapons at Defendant, or place him on the floor. Cf. Santa, 236 F.3d at 666. The door was propped open when they arrived. (Tr. 1, p. 12; Tr. 2, p. 7). Although Defendant was handcuffed, his handcuffing cannot be considered flagrant, considering that there was probable cause to arrest him for possession of illegal drugs that were in plain view or had been retrieved by Defendant.

In sum, considering the totality of circumstances, particularly the intervening circumstances and the purpose and conduct of the narcotics investigators, I conclude that Defendant's consent to search was sufficiently attenuated from any prior illegal entry, search, or illegal questioning such that the evidence seized after Defendant's consent should not be suppressed.

23

**E.**    **Defendant's statements to the narcotics investigators were voluntary**

Defendant argues that his statements to the narcotics investigators should be suppressed because they were tainted by his earlier un-<u>Mirandized</u> statements to Officer Funderbrik.  (Doc. 21, p. 27).

As an initial matter, Defendant made statements to the narcotics investigators that were not in response to any questioning before  the narcotics investigators could complete their advice of rights.  <u>Miranda v. Arizona</u>, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) applies only to statements given in response to questioning or its functional equivalent.  <u>Rhode Island v. Innis</u>, 446 U.S. 291, 301-02, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).  Defendant's volunteered statements were not the product of questioning or the functional equivalent of questioning and therefore should not be suppressed.

The admissibility of Defendant's post-<u>Miranda</u> statements in response to questioning by the narcotics investigators depends on the application of <u>Oregon v. Elstad</u>, 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).  In <u>Elstad,</u> the Court held that  an initial failure of the police to administer <u>Miranda</u> warnings to a suspect does not require suppression of that suspect's subsequent statements given after <u>Miranda</u> warnings and a waiver of rights.  470 U. S. at 318.   The Court explained:

24

> It is an unwarranted extension of <u>Miranda</u> to hold that a simple failure to
> administer the warnings, unaccompanied by any actual coercion or other
> circumstances calculated to undermine the suspect's ability to exercise his
> free will, so taints the investigatory process that a subsequent voluntary
> and informed waiver is ineffective for some indeterminate period.

<u>Id.</u> at 309  "A subsequent administration of <u>Miranda</u> warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." <u>Id.</u> at 314.

Defendant relies upon <u>Missouri v. Seibert</u>, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004), which narrowed the application of <u>Elstad</u>. <u>Seibert</u> establishes that suppression of a warned statement is required when a two-step interrogation technique is used by law enforcement in a calculated way to undermine the <u>Miranda</u> warnings. <u>See</u> <u>United States v. Street</u>, 472 F.3d 1298, 1313 (11th Cir. 2006).  In determining whether the law enforcement officers employed such a tactic, the court must consider the totality of circumstances which includes: "the timing, setting and completeness of the prewarning interrogation, the continuity of police personnel and the overlapping content of the pre- and post-warning statements." <u>Id.</u> at 1314.

There is no evidence that the narcotics investigators knew about Officer Funderbrik's earlier questioning, or that the narcotics investigators collaborated with Officer Funderbrik to obtain statements.  Moreover, the evidence established that

25

Defendant was anxious to provide information to the narcotics investigators in order to take responsibility for the drugs and guns in the room. Consideration of the relevant factors leads to the conclusion that the officers in this case did not employ a calculated technique to undermine Defendant's entitlement to <u>Miranda</u> warnings.

Defendant also suggests that his statements were not voluntary because they were motivated by the officers' agreement to release his young woman friend if he confessed. (Doc. 21 at p. 30). Although Defendant may have been motivated to waive his rights by a desire to protect his friend, such motivation does not render his waiver involuntary. The officers did not secure Defendant's waiver by making any promises about what would happen to his friend. The Fifth Amendment is not violated by "moral and psychological pressures to confess emanating from sources other than official coercion." <u>Elstad</u>, 470 U.S. at 305. The evidence established that Defendant knowingly and intelligently waived his rights.

### III.    <u>CONCLUSION</u>

In sum, I **RECOMMEND** that Defendant's Motion to Suppress Statements [Doc. 11] and Defendant's Motion to Suppress Evidence [Doc. 12] be **GRANTED IN PART AND DENIED IN PART**. I recommend that the evidence located and seized after the Defendant gave consent to narcotics investigators, and the statements that he made to

AO 72A
(Rev.8/8
2)

the narcotics investigators not be suppressed, but that all other evidence and statements be suppressed. The Government's motion to extend time for filing is hereby **GRANTED** *nunc pro tunc.*

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial. It is therefore **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

It is so **ORDERED** and **RECOMMENDED**, this  28th  day of June, 2012.

*Gerrilyn G. Brill*

GERRILYN G. BRILL
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev.8/8
2)